Florenz R. OURISMAN and Betty Joan Ourisman, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 84–1718.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1985.

Decided April 29, 1985.

---

**542**

Farley P. Katz, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellant.

Jerry M. Hamovit, Washington, D.C. (Howard N. Solodky, Melrod, Redman & Gartlan, Washington, D.C., on brief), for appellees.

Before WIDENER and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WIDENER, Circuit Judge.

The Commissioner of Internal Revenue appeals the Tax Court's determination that a corporation was a true, nontaxable, agent of its principal, a partnership, even though the corporation was wholly owned and controlled by the partnership. *Ourisman v.* *Commissioner,* 82 T.C. 171 (1984). We reverse because we are of opinion that the Tax Court erred in finding that the corporation was the true nontaxable agent of the partnership under the test for agency status established by the Supreme Court in *National Carbide v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).

Florenz Ourisman and Betty Joan Ourisman (taxpayers) filed joint federal income tax returns for the tax years 1970, 1971, and 1972 which are in issue here. During the years in issue, Ourisman was engaged in the business of real estate as an investor and developer. In 1969, Ourisman and Donohoe Construction Co., Inc. (Donohoe) explored the possibility of constructing an office building on Wisconsin Avenue, N.W., in the District of Columbia. Ourisman and Donohoe located a desirable site for the commercial real estate development, and, on October 18, 1969, Ourisman and Donohoe, as tenants, entered into a 99-year ground lease for property located at 5225 Wisconsin Avenue (the property).

Thereafter, Ourisman and Donohoe sought financing for the construction of a six-story office building on the property (the project). They submitted a mortgage loan application to American Security & Trust Company (AS & T) requesting a loan in the amount of $3,500,000. The mortgage loan request listed as the owner of the property Wisconsin-Jenifer Joint Venture, a partnership in which Ourisman had an 80 percent share and Donohoe had a 20 percent share. On January 9, 1970, American Security Corporation, an affiliate of AS & T, issued a loan commitment to provide interim financing for the project in the amount of $3,150,000 at an interest rate of 10 percent per annum. The commitment provided that AS & T would make the loan only to the "Corporate Nominee of Wisconsin-Jenifer Joint Venture." The commitment further required the loan to be secured by a first deed of trust on the property. AS & T required the loan to be executed to a corporate nominee of the partnership because, at the time, the 10 percent interest rate would have been usurious if

the loan were made to the partnership. While 10 percent was then the prevailing interest rate for construction loans, District of Columbia law provided that an interest rate in excess of 8 percent on loans made to noncorporate borrowers was usurious.[1] Because the 8 percent usury ceiling was not applicable to corporate borrowers, to extend financing AS & T required that the nominal debtor be the corporate nominee of the partnership and that such corporate nominee hold record title to the property.

On February 5, 1970, Ourisman and Donohoe formed Wisconsin-Jennifer, Inc. (the corporation), a District of Columbia corporation. Although the articles of incorporation stated that the corporation had broad powers to deal in real estate and to engage in activities related to real estate development, the corporation's board of directors passed a resolution on the day the corporation was formed specifically providing that the corporation would act as a nominee or agent for the partnership.[2]

The construction loan was closed on May 7, 1970, and, on that date, several documents were executed: (1) Ourisman and Donohoe executed an agreement forming a limited partnership, 5225 Wisconsin Associates (the partnership), as the successor to the partnership Wisconsin-Jenifer Joint Venture; (2) the partnership executed an assignment of its leasehold to the corporation for the stated consideration of $10; (3) the partnership and the corporation executed an agency agreement whereby the corporation agreed that it would hold the leased property and any improvements constructed thereon, borrow and repay the AS

& T construction loan, and erect a six-story office building on the property

> ... solely as nominee, dummy and straw party for the Partnership, and the Partnership is and shall continue to be the Corporation's principal, the true and lawful owner of the leasehold conveyed to the Corporation simultaneously herewith, together with all improvements erected thereon, and the real party in interest in the aforesaid agreements and transactions;

(4) the corporation, as borrower, signed the building loan agreement with AS & T and executed a promissory note and deed of trust in favor of AS & T; (5) Ourisman and the principal shareholders of Donohoe executed a personal guaranty of the AS & T loan; and (6) the corporation and Donohoe executed a leasing and management agreement whereby Donohoe agreed that it would act as the corporation's sole and exclusive leasing and management agent for the office building to be built on the property.

By executing these documents, Ourisman and Donohoe intended to retain all but the record title to the leasehold and the building to be constructed thereon until such early time as it would be practical for the corporation to reconvey title to the partnership. Throughout the period of time that the corporation held title to the leasehold, the partners always regarded themselves as the real owners of the property and, consistent with such, conducted their business dealings with third parties by representing that the partnership was the owner of the property. For example, between

---

1. 28 D.C.Code § 3301 (8% usury ceiling on loans to noncorporate borrowers).

2. The resolution provided in relevant part that: Wisconsin-Jennifer, Inc. act as nominee for 5225 Wisconsin Associates:
 To purchase, acquire, hold, improve, operate, sell, convey, and assign title to real and personal property, all as a nominee for a principal or principals;
 To borrow or raise money for any of the purposes of the corporation, and to secure the payment thereof, and of the interest thereon, to execute mortgages or to pledge, convey or give an assignment or deed in trust of the whole or any part of any real or personal property, including contracts, choses in action or other intangible property of the corporation;
 To carry out any part of the foregoing objects, as nominee or agent, either alone or through or in conjunction with any person, firm, association or corporation, and in any part of the world, and, in carrying on its business and for the purposes herein specified, or which at any time may appear conducive to or expedient for the accomplishment of any such purposes.

May 1970 and November 1971, the partnership executed 17 leases with prospective tenants of the office building, designating the owner of the property as the partnership. The contracts with the architects for the design and construction of the office building listed the owner as Ourisman and Donohoe, individually or as partners; the insurance policy for the project was issued in the name of Wisconsin-Jenifer Joint Venture, et al., the partnership predecessor of the partnership; and the applications to the District of Columbia for certificates of occupancy indicated that the partnership was owner of the property.

After construction of the office building had begun, on March 15, 1971 the partnership applied to Jefferson Federal Savings and Loan Association (Jefferson) for permanent financing. While the loan application listed the corporation as the applicant, the application further specified that Ourisman and Donohoe were the owners of the property. On March 23, 1971, Jefferson issued a loan commitment to provide permanent financing in the amount of $3,650,-000 at an interest rate of 8½ percent per annum.

On October 28, 1971, the corporation's board of directors resolved that the corporation would secure the permanent financing from Jefferson, "acting solely, however, as the nominee and at the direction of the owner of said leasehold estate, 5225 Wisconsin Associates." The permanent loan was closed on November 4, 1971. The corporation, as nominal borrower, issued Jefferson a promissory note that was secured by a deed of trust on the property. There was no personal guaranty of the note. On the date of closing, the corporation also reassigned the leasehold to the

partnership. The corporation was dissolved on June 28, 1972.

While the corporation was in existence, it never opened a bank account. Instead, after the corporation received periodic loan proceeds, it endorsed the checks to the partnership, and the partnership paid all of the expenses associated with the building project. The partnership made all of the interest and principal payments to AS & T on the interim financing loan and to Jefferson on the permanent financing loan. The corporation filed income tax returns for 1970 and 1971 and reported no income, listed no assets or liabilities, and stated "Corporate Nominee" as its business activity. No capital was ever paid into the corporation and no stock was ever issued. The corporation received no rental income because Donohoe, as leasing agent, collected the rents and distributed them directly to the partnership.

For the years 1970 through 1972, the partnership, rather than the corporation, claimed the losses attributable to the holding of the ground lease and the construction and operation of the office building. Accordingly, taxpayers deducted their share of the partnership's losses. The Commissioner issued taxpayers a notice of deficiency, claiming that taxpayers were not entitled to deduct their share of the losses attributable to the property and building project because such losses belonged to the corporation and not to the partnership.[3] He determined that since the partnership was not entitled to deduct those expenses incurred during 1970 and most of 1971 which were attributable to the holding of the lease and the construction and operation of the office building, such

---

**3.** The Commissioner disallowed taxpayers' deductions of expenses attributable to the project in 1970 and 1971 in the respective amounts of $154,430.75 and $388,913.21. These disallowed expenses were allocated to the corporation, *see* 26 U.S.C. § 482 (IRC § 482), and included *inter alia* interest expense, ground rent expense, and real estate taxes. The Commissioner further disallowed depreciation deductions for the years 1971 and 1972 in the respective amounts of $11,811.96 and $89,780.53. After allocating income from the project to the corporation in

the amount of $99,830.59, *see infra* note 4, with the resulting decrease in partnership income, the Commissioner determined that taxpayers were entitled to deduct their distributive share of partnership losses which differed from the amounts claimed in the following respects:

| Year | Loss Amount Claimed | Loss Entitled to Deduct |
|------|---------------------|-------------------------|
| 1970 | $133,625.47 | $9,482.17 |
| 1971 | $273,596.45 | $32,880.78 |
| 1972 | $163,383.23 | $91,558.81 |

losses would not pass through to the partners. He further determined that the income earned from the project was income of the corporation, resulting in a decrease of partnership income.[4] Finally, in addition to finding that in 1970 taxpayers realized ordinary income on corporate cash distributions which exceeded taxpayers' basis in the corporation's stock, the Commissioner determined that taxpayers realized gain on the distribution in liquidation of the corporation in 1971 and that this income was ordinary income because the corporation was a collapsible corporation within the meaning of section 341 of the Internal Revenue Code.[5]

The taxpayers timely petitioned the Tax Court seeking a redetermination of the deficiencies asserted by the Commissioner. That court applied the test for nontaxable agency status announced by the Supreme Court in *National Carbide v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1942), in accordance with its disposition of a similar corporate agency issue in *Roccaforte v. Commissioner*, 77 T.C. 263 (1981), *rev'd.* 708 F.2d 986 (5th Cir.1983), and held that the corporation was the agent of the partnership and that the losses generated by the project were therefore partnership losses which would pass through to the partners. Because the Tax Court determined that the partnership was the owner of the project for tax purposes, the court did not reach the other issues, including whether the taxpayers' recognized gain on the liquidation of the corporation and whether the gain, if any, was ordinary income rather than capital gain.

The sole issue in this appeal is whether the corporation was, for tax purposes, a true agent of the partnership with respect to the project, thus entitling the partnership to deduct expenses related to the project. It is undisputed that the partnership formed the corporation solely for the purpose of holding title to the property so that the corporation, as nominal borrower, could be charged the prevailing interest rates on the loans which would be usurious if charged to the partnership. Besides holding title to the property, receiving the interim financing loan proceeds for the benefit of the partnership, and securing permanent financing for the project, the corporation performed no other essential functions regarding the project. Instead, it was the partnership, in all other respects, that developed, constructed, and operated the building project. Notwithstanding the corporation's limited functions, taxpayers do not contend that the corporation was a nonviable entity which should be disregarded for tax purposes.[6] Rather, taxpayers contend, and the Tax Court so found, that since the corporation was an agent for the partnership with respect to the project, the partnership as principal was the entity responsible for the project's tax consequences.

We think the Tax Court erred in its determination that the corporation was a true agent of the partnership with respect to the building project. In determining that the corporation was a nontaxable agent of

4. For the same reasons that the Commissioner allocated the losses from the project to the corporation, the Commissioner determined that the income earned from the project from January 1971 until November 1971 was attributable to the corporation and not to the partnership. The effect of the allocation of income to the corporation was to reduce taxpayers' income for 1971 by $99,830.59.

5. The Commissioner determined that taxpayers' interest in the net assets of the corporation's distribution in liquidation was $1,244,746.06 and that taxpayers' basis in the corporation's stock was $40,000. The Commissioner further determined that the resulting $1,204,746.06 gain on liquidation was ordinary income under 26 U.S.C. § 341 (IRC § 341).

6. Taxpayers do not contend that the corporate entity should be disregarded for tax purposes because it was a mere passive dummy of its shareholders. That theory, unlike the agency theory, asserts that a corporate entity should be ignored for tax purposes because the corporation is a nonviable entity. *See Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940). We hasten to add that the body of law which has grown up around closely held and subsidiary corporations for tax purposes frequently bears little relation to general law on the same subject.

the partnership, the Tax Court applied a six-factor test for ascertaining nontaxable agency status that the Supreme Court established in *National Carbide, supra.* In *National Carbide,* the Court rejected a corporate agency argument in the tax context but, nevertheless, indicated that a corporation could be a true nontaxable agent of its principal in certain circumstances. In this connection, the Court stated:

> What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. [1] Whether the corporation operates in the name and for the account of the principal, [2] binds the principal by its actions, [3] transmits money received to the principal, and [4] whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. [5] *If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case.* [6] Its business purpose must be the carrying on of the normal duties of an agent.

336 U.S. at 437, 69 S.Ct. at 734 (footnote omitted) (emphasis added).

The Tax Court considered the six *National Carbide* factors and, consistent with its disposition of a factually similar corporate agency argument in *Roccaforte, supra,*[7] determined that the facts of the present case required the conclusion that the corporation was the true agent of the partnership with respect to the building project. *See* 82 T.C. at 181–87. Applying each of the six *National Carbide* factors, the Tax Court found that: (1) the corporation acted in the name and for the account of the partnership (factor 1); (2) the corporation bound the partnership by its actions (factor 2); (3) to the extent that the corporation received funds in the form of loan proceeds, the corporation immediately endorsed such checks to the partnership (factor 3); (4) any income realized from the building project was attributable to the efforts and assets of the partners (factor 4); and (5) the corporation's business purpose and activities consisted of the carrying on of the normal duties of an agent (factor 6).[8]

The principal thrust of the Commissioner's argument on appeal is that the Tax Court erred in finding that the corporation was a "true corporate agent" under the fifth factor specified in *National Carbide.* Consistent with its disposition of an indistinguishable issue in *Roccaforte,* the court concluded that the proscription in the fifth factor is not mandatory. The court found that despite the mandatory language in the

---

7. As in the present case, the taxpayers in *Roccaforte* formed a corporation to avoid state usury laws that precluded the taxpayers, as a partnership, from obtaining financing for a construction project. *See* 708 F.2d at 987. The corporation held title to the real estate involved and borrowed the money for its development. The partnership, as controlling shareholder of the corporation, required the corporation to execute nominee and agency agreements whereby the corporation agreed that it would take no action unless authorized by the partnership. The partnership agreed to reimburse the corporation for its expenses, to inform all lenders of the corporation's status as agent, and to hold the corporation harmless from any liabilities arising from the construction project. On their individual income tax returns, the partners deducted the losses generated by the construction project. The Tax Court held that the partners could deduct their share of the losses because the corporation was the true agent of the partner-

ship with respect to the project. 77 T.C. 263, 283–88 (1981). On appeal, the Fifth Circuit reversed, finding that the Tax Court improperly applied the test for agency status. 708 F.2d at 987.

Even though the Tax Court in the present case found that *Roccaforte* was indistinguishable, the court nevertheless applied *National Carbide* as it had applied that case in *Roccaforte,* noting that venue for this appeal was in either the Fourth Circuit or the District of Columbia Circuit and that it was not bound by the decision of the Fifth Circuit in *Roccaforte.*

8. The Commissioner argues that the Tax Court also erred in its determination that factors (1) and (6) of the *National Carbide* test were satisfied. Since we are of opinion that a failure to properly apply factor (5) is sufficient to support our decision, we express no opinion upon the merits of that argument.

fifth factor which provides that a corporation's "relations with its principal must not be dependent upon the fact that it is owned by the principal," taxpayers nevertheless satisfied the fifth factor because they had proved that the agency existed independently of the shareholders' ownership and control of the corporation. In this regard, the Tax Court determined that even though the corporation's relations with the partners were based "to a certain extent" upon the control that the partners exercised over the corporation by virtue of the partners' positions as shareholders, independent of this control, the corporation nonetheless acted as agent for its shareholders because, while the corporation did conduct negligible business activities in holding the lease to secure financing for the project, the partners in actuality conducted the substantial activities with respect to the project and, in dealing with third parties, the partners assumed the burdens of principalship and treated the corporation as their agent. The Tax Court reasoned that although the corporation acted for no other principal and received no compensation for its services, it acted no differently than an independent agent would have acted if such agent had bargained with its principal for its services at arm's length.

As stated, the central issue of this appeal concerns the effect that should be given to the language in *National Carbide*'s fifth factor. While the first four factors set out general principles of agency law to serve as "relevant considerations" for the determination of whether a true agency exists, *see* 708 F.2d at 989, the fifth factor states in mandatory terms that for a corporation to be a true agent "its relations with its principal must not be dependent upon the fact that it is owned by the principal." [9] 336 U.S. at 437, 69 S.Ct. at 734. Despite this mandatory language, the Tax Court concluded that contrary to the Fifth Circuit's assertion in *Roccaforte* that the fifth

factor was "mandatory and absolute," *see* 708 F.2d at 989, there existed no indication that the Supreme Court in *National Carbide* intended to deny agency status to a corporation that satisfied factors one through four merely because the agency was based to a certain extent upon the control the shareholders exercised over the corporation. 82 T.C. at 185–86. As an alternative construction of the mandatory language in the fifth factor, the court stated that by such language the Supreme Court intended only to reiterate the Court's earlier holding in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), that, in a controlled corporation context, the taxpayers must prove that a corporation is an agent for its shareholders by "evidence other than the control which shareholders automatically possess over their corporations," *citing* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders*, ¶ 2.10 at 2–28 (4th ed. 1979). Under the Tax Court's construction of the *National Carbide* test, each of the six factors in effect is entitled to equal weight and significance, and, accordingly, no single factor would preclude a finding of agency if the indicia of agency were established by reference to the remaining factors. *Cf. Vaughn v. United States*, 740 F.2d 941, 945–47 (Fed.Cir.1984) (notwithstanding finding that agent and principal were under common ownership and control and that relationship would not have existed but for this ownership and control, court considered whether the other *National Carbide* factors were satisfied).

■ We are unable to adopt the Tax Court's construction of the *National Carbide* test. Like the Fifth Circuit in *Roccaforte*, we are constrained to give the fifth factor literal effect. Accordingly, we hold that under the mandatory proscription in the fifth factor, a corporation may not be a true nontaxable agent if its relations with

---

**9.** We note in passing that the sixth factor is phrased in equally mandatory language, providing that for a corporation to be considered as a true agent, "[i]ts business purpose must be the carrying on of the normal duties of an agent."

336 U.S. at 437, 69 S.Ct. at 734. The Fifth Circuit in *Roccaforte* determined that the sixth factor, like the fifth factor, is an absolute prerequisite for a finding that a corporation is a true nontaxable agent. 708 F.2d at 989.

its principal are dependent upon the fact that it is owned by the principal. Although it may be difficult for a controlled corporation to satisfy the condition of independency, such a showing is not impossible. In a controlled corporation context, a corporate agent might not be considered as dependent upon its principal notwithstanding the principal's ownership and control of the agent if it can be shown that the agency relationship reflects an arm's length arrangement between principal and agent. While we do not attempt to define what would constitute sufficient evidence to support a finding that an agency relationship was in fact an arm's length arrangement, it should be relevant to the determination to consider: the identity of ownership interests in the principal and agent, *see Vaughn*, 740 F.2d at 945; *Moncrief v. United States*, 730 F.2d 276, 284–86 (5th Cir.1984); whether a corporation's articles of incorporation or the first corporate resolutions specifically limit corporate purposes and powers so that the corporation may act only as an agent for third parties, *see* E. Baker & H. Rothman, *Straw Corporations: New cases shed light on tax-recognition criteria*, 45 J. Tax'n 84, 88 (1976); J. Kurtz & C. Kopp, *Taxability of Straw Corporations in Real Estate Transactions*, 22 Tax Lawyer 647, 657 (1969); whether the agent acts for more than one principal, *see* Note, *The Use of Corporations in Real Estate Transactions: Judicial Acceptance of the Agency Theory*, 8 J.Corp.Law 361, 384 (1983); whether the agent has entered into a written agency contract setting forth the duties and responsibilities of the agent and providing for a reasonable fee for the agent's services, *see* S. Kronovet, *Straw corporations: When will they be recognized; what can and should be done*, 39 J. Tax'n 54, 59 (1973); and, whether the agent has collected a reasonable fee for its services, *see id. See generally* E. Baker & H. Rothman, *Nominee and Agency Corporations: Grasping for Straws*, 33 N.Y.U. Inst. on Fed.Tax 1255, 1299–1301 (1975).

█ Applying the foregoing considerations, we find that the Tax Court erred as a matter of law in determining that the corporation was a true nontaxable agent under *National Carbide*. The court made explicit factual findings that we conclude, as a matter of law, preclude an agency finding under the proscription in the fifth factor. First, the court found that the corporation's relations with the partners were based to some extent upon the control the partners exercised over the corporation as shareholders. Secondly, the court found that the partners' interests in the corporation coincided with the partners' interests in the partnership. It also determined that the corporation acted solely for the partnership and received no compensation for its services. Finally, based on the foregoing findings, the court determined that it was unable to conclude that the corporation bargained at arm's length with the partnership for the corporation's services as agent.

Given these factual findings which are not clearly erroneous, we are unable to conclude that the corporation's relations with its principal, the partnership, were not dependent upon the fact that the partnership owned and controlled the corporation. Even though the partners scrupulously structured their affairs by limiting the corporation's powers to act as agent for the partnership with respect to the project and by executing a formal agency agreement to that effect, the mere fact that third parties regarded the corporation as the partnership's agent does not alter our conclusion that the corporation and partnership did not bargain at arm's length. Accordingly, we find the Tax Court erred in concluding that the corporation was a true agent because taxpayers have failed to establish that the agency relationship was not dependent upon the partners' ownership and control of the corporation.

While we are not unsympathetic to taxpayers' situation, for tax purposes *National Carbide* requires us to focus on certain aspects of a corporate agency relationship to ascertain whether the relationship is "entirely consistent with the corporation-sole shareholder relationship whether or not any agency exists." *See* 336 U.S. at

436, 69 S.Ct. at 733. Under this analysis, an agency agreement between shareholders and their controlled corporation should not be given effect if the relationship created thereby is entirely consistent with the control that shareholders usually exercise over the corporation. *See Roccaforte*, 708 F.2d at 990. Such a result simply recognizes the fact that if the agency relationship could not exist but for the shareholders' ownership and control of the corporate agent, the alleged agency relationship is nothing more than a manifestation of the underlying corporation-shareholder relationship and that the corporation therefore must be regarded as a separate taxpaying entity under our system of separate taxation of corporations.

As an abstract proposition, if such a corporation as is before us now were treated as a nontaxable agent for its controlling shareholders, the shareholders individually would incur the corporation's tax consequences even if it be conceded that the corporation conducted sufficient business activity under *Moline Properties* to constitute a viable separate taxable entity. Taking this proposition to its logical conclusion, shareholders with impunity could take advantage of the system of separate taxation of corporations by treating their corporation as a separate taxable entity with respect to some transactions while treating the corporation as a nontaxable agent with respect to other transactions. We think *National Carbide* attempts to prevent this potential abuse by limiting a finding of corporate agency to only those situations in which the existence of the agency does not depend upon the shareholders' ownership and control of the corporation.

Accordingly, the judgment of the Tax Court is vacated and the case is remanded for further consideration of any undecided issues in the case which may be necessary because of this decision. However, whether or not the corporation was a nontaxable agent of the partnership is no longer an open question.

VACATED AND REMANDED.